Filed 11/14/22 In re Wright CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re CHEVAL SHANNON WRIGHT on Habeas Corpus. | C094514 <br><br> (Super. Ct. No. 20HC00287) |

Defendant Cheval Shannon Wright's 1995 convictions included murder, attempted murder and robbery. Various subsequent proceedings have modified defendant's legal accountability for his involvement in the robbery, during which two people were shot. The instant matter involves the People's appeal from the trial court's ruling granting defendant's petition for writ of habeas corpus and vacating the robbery-murder special-circumstance finding. The People argue that the trial court erred in applying the wrong standard of review by relying on the jury's negative finding on the personal use of a firearm allegation to discount evidence that defendant was the shooter and, in doing so, reached a conclusion not supported by the record. In response, defendant argues that the jury's verdicts point to only one conclusion; defendant's actions in restraining the actual

1

shooter do not demonstrate a reckless disregard for human life. Because under our deferential standard of review, substantial evidence supports the jury's true finding on the special circumstance allegation at issue here, we shall reverse.

## FACTUAL AND PROCEDURAL HISTORY

This court first affirmed the convictions of defendant and codefendant Christian Abernathy in *People v. Wright* (1996) 52 Cal.App.4th 203. Four years later, a federal trial court adopted the findings of its magistrate who sustained defendant's petition for habeas corpus, set aside defendant's convictions and granted a new trial. On retrial, a jury again convicted defendant of first degree murder and attempted second degree robbery of Kevin Brown, and second degree robbery of Marlin Moore. (Pen. Code, §§ 187-189, 211-212.5, 664.)[1] In contrast with the previous jury, however, it acquitted defendant of the attempted murder and the lesser included offenses of attempted voluntary manslaughter and assault with a firearm of Moore (§§ 187, 192, 245, 664), rejected all allegations that defendant personally used a firearm (§ 12022.5, subd. (a)) and instead sustained lesser included allegations that a principal was armed during the crimes (§ 12022, subd. (a)(1)). It also found the murder occurred during the commission of a robbery. (§ 190.2, subd. (a)(17)(A).) The trial court again sentenced defendant to prison without the possibility of parole. On appeal, this court affirmed defendant's convictions. While we did not address the sufficiency of the evidence supporting the special circumstances finding, we did note that the jury resolved the issue of the identification of the shooter in favor of defendant. (*People v. Wright* (Dec. 11, 2002, C039121) [nonpub. opn.].)[2]

---

[1] Unspecified statutory references are to the Penal Code.

[2] We granted the People's request to incorporate by reference the appellate record in *People v. Wright, supra*, C039121.

After defendant's conviction became final, the California Supreme Court decided *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), and later *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*), which clarified the meaning of the special circumstance statute. That statute provides that a person who is not the actual killer but "who, with reckless indifference to human life and as a major participant" aids or abets an enumerated felony that results in a death may be convicted of special circumstance murder and sentenced to death or life imprisonment without parole. (§ 190.2, subd. (d).) *Banks* and *Clark* clarified that fact finders must examine an aider and abettor's personal culpability that led to a death during the commission of a felony before imposing a sentence of death or life without parole, and the Supreme Court provided guidance on how to make that evaluation. (*Banks*, at pp. 800-803; *Clark*, at pp. 618-623.)

Also subsequent to defendant's conviction, the Legislature adopted Senate Bill No. 1437 (2017-2018 Reg. Sess.; Stats. 2018, ch. 1015, eff. Jan. 1, 2019) (Senate Bill 1437). Senate Bill 1437 limited felony-murder liability to those who in the course of committing an enumerated felony were the actual killer, aided and abetted the actual killer with the intent to kill, or were major participants in the underlying felony and acted with reckless indifference to human life. (§ 189, subd. (e).) Senate Bill 1437 also provided in former section 1170.95,[3] a procedure for defendants previously convicted of felony murder to petition for resentencing if they could not have been convicted under the amended felony-murder statute.

Defendant unsuccessfully sought relief under the resentencing provisions of former section 1170.95. We affirmed the trial court's denial of the postjudgment motion, concluding that a prerequisite to relief for defendants who, like Wright, are convicted of

---

[3] Effective June 30, 2022, Assembly Bill No. 200 (2021-2022 Reg. Sess.) renumbered section 1170.95 as section 1172.6 with no change in text. (Stats. 2022, ch. 58, § 10.)

murder with a special circumstance finding that the murder was committed in the course of the robbery is to have the special circumstance finding vacated through a habeas corpus proceeding. (*People v. Wright* (Sept. 28, 2021, C091633) [nonpub. opn.], review granted Dec. 15, 2021, S271574, vacated & trans. for reconsideration in light of *People v. Strong* (2022) 13 Cal.5th 698 Oct. 26, 2022.)[4]

Defendant has done so, and we now review that ruling. Because there was no evidentiary hearing in the habeas corpus proceeding, we are bound by the facts established at the second trial. Like the trial court, we rely on the relevant facts recounted in the appellate opinion from defendant's second trial, clarifying with evidence from the record where we deem appropriate.

In 1993, defendant drove a Hyundai to the home of acquaintances, where he joined a group drinking alcohol and smoking marijuana. Five of the partiers, including defendant, departed in the Hyundai to buy more alcohol. Defendant was too inebriated, so he asked someone else to drive. Codefendant was also high. Prior to this, another partier saw codefendant with a gun.

The two victims were among the four occupants of an Oldsmobile convertible that was dropping off one of the passengers in the North Highlands area. As the convertible neared the passenger's home, it passed the Hyundai, which was heading the opposite direction. Defendant told the Hyundai driver to make a U-turn. As the convertible began its own U-turn to drop off the passenger, the Hyundai stopped in front of it.

---

[4] The nature of the question on review in the direct appeal from the denial of defendant's petition for relief under former section 1170.95 is distinct from the before us and review of the instant habeas corpus proceeding will not interfere with that matter while the People exercise their right under section 1506. (See *France v. Superior Court* (1927) 201 Cal. 122, 126-127 [the writ of habeas corpus is an action independent of the underlying criminal prosecution].)

4

According to a bystander who witnessed the crimes, a man got out of the Hyundai and approached the convertible. The Oldsmobile's convertible top was lowered or open. The man from the Hyundai yelled at the occupants in the Oldsmobile, then pointed a gun at them. A second man got out of the Hyundai and attempted to restrain the first. The first man (who was darker-complected) broke free and fired two or three shots. The bystander identified defendant as the second man, based primarily on his lighter complexion and physical appearance in comparison with codefendant. In 1993, the bystander was not able to identify either codefendant or defendant in photo lineups.

A deputy assigned to the jail in October 1994 testified that he conducted a random search of codefendant's mail. He found an outgoing letter bearing codefendant's return address and signature in which was written, "Just 'cause I got out of the car with the [gun], that don't prove shit."

***Victim Accounts***

A. *Marlin Moore*

The convertible driver, Marlin Moore, was deceased by the time of the retrial. His testimony from the first trial was read to the jury in the retrial. Moore testified that he and some of his passengers smoked marijuana and drank alcohol that day, but he was not high at the time of the incident.[5] On their way to take someone home, a Hyundai pulled in front of him, stopped and cut him off. Two men simultaneously got out of the Hyundai. Both of them wore blue colored rags at their waists, which suggested gang membership. The first, who was dark-complected and later identified as codefendant, walked up to the convertible and asked where the occupants lived. He was holding a

---

[5] The effects of marijuana on Moore's ability to perceive, interpret and remember events were explored on cross-examination.

gun.[6] Moore said he was from Oakland and did not "gang bang." Codefendant then demanded money and nudged or tapped Moore on the forehead with the gun. The other man, who had a lighter complexion and was later identified as defendant, hung back, did not say anything or take any money, but also did not try to stop the robbery. Moore was in the process of offering the $10 or so in cash he had in his pocket when he heard gunfire.

Moore looked behind him and saw that Kevin Brown, the murder victim, was grimacing. Defendant looked "shocked," "startled" and "stunned." Defendant grabbed codefendant from behind in a bear hug and said something to the effect of "stop," "cut it out," "you already shot him." Moore grabbed at the gun. Defendant pulled at codefendant, pulling him back. Codefendant waived the gun around and tried to point it at Moore's head. Moore got hold of the gun, but as the barrel began to slip out of his hand, he pushed it away and floored the accelerator. From the rearview mirror, Moore saw codefendant fire a shot in the direction of the convertible as it drove off. After traveling about half a block, Moore discovered he had been shot. He had a bullet wound in his stomach.

A couple of weeks later, Moore viewed two photo lineups. He identified codefendant as the shooter, but could not recall making the recorded statement "he's the one that shot at me, that looks like the fool right there, I'm sure." As to defendant, Moore testified that he recognized defendant's photo in the lineup but told the officer he did not recognize anyone. He explained, "I felt he tried to stop it, and I didn't feel as though he should get in any trouble for anything he did." He credited defendant for saving his life and the lives of the rest of the people in his car.

---

[6] Moore said that because he did not immediately see the gun, it was possible that defendant handed the gun to codefendant but it was a "guess" and he did not see it passed.

6

Moore was an unwilling witness; he did not wish to testify because he was facing the start of his own prison term and did not want to be known as a snitch for testifying. Before his initial testimony at the preliminary hearing, he found himself in the same holding cell as defendant, with whom he spoke.[7] He immediately recognized defendant as the person who grabbed the shooter and he testified that he wanted to help defendant with his testimony. While Moore was willing to adhere to his identification he made at the preliminary hearing of defendant as the person who attempted to restrain the shooter, he would not identify codefendant as the shooter even though he had picked his photo in a lineup a few weeks after the shooting. However, Moore had admitted to both defense and prosecution investigators in interviews before and after the preliminary hearing that codefendant was the shooter.

B. *Joe Jones*

The surviving male convertible passenger, Joe Jones, also testified that codefendant approached the car, gun in hand, and questioned them before demanding money. One of the men, believed to be codefendant, said "this is North Highlands, cuzz." Jones saw codefendant shoot at the murder victim and Moore. Someone then grabbed codefendant, and they struggled for the gun. After the second gunshot injuring the driver, somebody, maybe defendant, grabbed the gun and said "you trippin." He could not remember if defendant walked up with a gun; he only remembered that defendant had the gun when he grabbed codefendant after the second shot and struggle. A third person walked up at the time of the first shooting; this all happened within seconds. When confronted with his testimony at the preliminary hearing that someone had grabbed the gun from the first man, he corrected his recollection. He believed

---

[7] During his appearances as a witness in the previous trial, he was in the same holding area with defendant and codefendant on at least 10 occasions. Norwood Armstrong, another Hyundai passenger, were also in the holding area.

codefendant was the second person to approach the car, at which point he took the gun from the first person and immediately fired it at them. Whatever his confusion, he was still certain that codefendant was the shooter. When asked if he remembered his testimony at the preliminary hearing whether he was certain that both codefendant and defendant had their hands on the gun, Jones said "yes." He did not identify codefendant in a photo lineup, but the Jones attributed his difficulty due to the poor quality of the picture of codefendant.

C. *Nakisha Woods*

The female convertible passenger, Nakisha Woods, testified that the car containing defendant and codefendant pulled up in front of their car and blocked them and they could not get out of their car. Wood testified that codefendant approached the car, and aggressively questioned them about their places of residence. Codefendant was familiar to her from the neighborhood, but she did not know him. Defendant then approached the car. He was wearing a colored bandana and had a gun in his hand. None of the occupants of the convertible were wearing red or blue gang colors. Woods heard someone say "break yourself," which meant for her group to give them money or anything of value. She was not sure which one of the defendants demanded money. She thought the murder victim pulled a dollar out of his pocket. She did not see who fired shots and could not recall if codefendant had the gun in his possession at any time (although she acknowledged testifying in the first trial that he held it at some point). In interviews with the police shortly after the shooting, Woods said three men got out of the Hyundai and ran toward the convertible, but she could not now recall the interviews. She made other statements in which she contradicted herself as to whether defendant or codefendant held the gun, the possibility there was a third person who approached from the Hyundai, and as to their physical appearances, but she was consistent in her statement that she was not sure who fired the gun.

8

*Hyundai Occupant Accounts*

The occupants in the Hyundai riding with defendant were close friends and members or associates of the same gang faction as codefendant. The female Hyundai passenger and codefendant were also family members and she admitted there was a lot of pressure to not "snitch." Defendant, on the other hand, was from a different neighborhood faction of the gang. The other occupants had only recently met defendant and did not owe any particular loyalty to him.

A. *Lovia Richardson*

The female Hyundai passenger, Lovia Richardson, testified that the plan was to buy more alcohol, and the occupants of the car pooled their money to do so. No one talked about robbing anyone and she never saw a gun in the car. When they encountered the second car, she did not see either defendant or codefendant with a gun. She could not hear what they said to the convertible occupants. When she heard a gunshot, she and the fourth Hyundai occupant got out of the car. She saw defendant with the gun in his hand. Defendant argued with codefendant, there was a scuffle that also involved the fourth Hyundai occupant, and a second shot was fired. She yelled "let's go, what are you guys doing, let's get out of here." There was a lot more yelling, the men ran back to the Hyundai, got in and they drove away. Richardson testified she never saw a gun in codefendant's hand.

B. *Raymond Rice*

The Hyundai driver, Raymond Rice, testified that as they were driving to the liquor store, there was no discussion about committing a robbery and he did not see a gun until after the shooting. Somebody told him to pull over. He could not remember who said it, although he admitted that at the first trial he testified it was defendant who waived to the people in a convertible as if he knew them and directed Rice to stop. Rice testified he pulled up in front of the convertible but did not block the path of the other car. He claimed that after he stopped, all of his passengers got out of the car. He heard someone

9

say, "break yourself," but did not remember who said it. He heard two gunshots, with not too much time between them, but could not tell who fired the gun. Rice testified that he did not see anybody with a weapon and did not remember telling an investigator that he saw defendant with a gun in his hand. After the shot was fired, Rice saw Richardson and the other male Hyundai passenger, Norwood Armstrong, pulling defendant back to the car. After the shooting, they returned to Marsell Hobb's house. While at the house there was discussion about what happened, and Rice saw defendant pull $10 out of his pocket and say, "All I got is ten dollars."

C. *Norwood Armstrong*

The other male Hyundai passenger, Norwood Armstrong, testified that as they were driving to the liquor store, defendant made a motion to do a U-turn. After defendant and codefendant got out of the car, he heard defendant say, "break you all yourselves," meaning give up the money, and he then heard a shot. He heard defendant say, "you all mother fuckers think I'm playing." He got out of the Hyundai and saw defendant fire a second shot at the convertible driver, after which he helped codefendant to restrain defendant and pull him back to the Hyundai. He did not see a gun in the car prior to the shooting.

***Aftermath***

Everyone in the Hyundai returned to the house where they had been partying. They parked the car around the corner. People were agitated and talking about the shooting. Defendant looked shocked and asked for a change of clothes; he was pacing. Somebody attributed the shooting to defendant; though present, he remained silent and did not deny it.[8] Rice said defendant pulled money out of his pocket and said "all I got was ten dollars from it."

---

[8] The witness testifying to this adoptive admission had not mentioned it in the earlier trial.

Defendant's girlfriend at the time of the shooting testified that defendant borrowed the Hyundai from her roommate. Shortly after the shootings, defendant phoned his girlfriend and said she should report that the car was stolen. He would not elaborate. Later that night, defendant met with his girlfriend around the corner from her apartment and returned the keys. He then moved to Fairfield with his girlfriend, where he cut his hair and attempted to find a job.

Defendant's videotaped interview by law enforcement was played for the jury. He said that he let someone borrow the car, and that person left the car at a house that was raided. Defendant told his girlfriend that she should report the car stolen. At some point, the car keys were returned to defendant. Defendant said he did not know anything about a gun.

Hearing of defendant's August 1993 arrest, the murder victim's widow came to see him in jail accompanied by her teenage niece. She identified herself and asked why he had killed her husband. Defendant said he was sorry for what happened, and he would trade his life for her husband's if he could. She claimed the visit lasted 10 to 15 minutes. The widow did not mention this conversation at the first trial, nor did she tell the prosecutor retrying the case about it until one or two days after meeting the prosecutor. She could not explain the omission, other than having been "emotionally stressed out . . . and I just didn't think about telling anybody." She also thought that perhaps it was improper to have visited him.

The jail records show a visit from the widow, accompanied by a minor, on September 2, 1993, at 1:06 p.m., and both an in and out time for defendant of 1:12 p.m. One cannot necessarily determine from these records either the length of a visit, or if an inmate refused to speak with a visitor. There was nothing otherwise to corroborate her conversation with defendant.

11

*Gang Evidence*

The evidence suggested defendant was in a gang, including owning a blue bandana as well as a blue Georgetown University baseball cap. Another gang member testified defendant was a member of his gang, although in a different subset.[9] A gang expert testified to general behavior from gang members. For example, he said it was common practice for gang members to stop unknown people for identification because neighborhoods are "territory" and those people may have to pay a toll for being there. The gang expert also testified that a gang member may elevate his own status within the gang by doing something ruthless, like committing an assault, robbery or homicide. The driver of the Hyundai, a self-proclaimed gang member, agreed with that assessment. The driver said once you are in the gang, "the dirt comes natural. That is part of being in a gang, selling dope, fighting, whatever." He also said that, if a person was "living that lifestyle," it would not be bizarre for that person to stop somebody in the neighborhood and find out who they are or to tell a stranger "this is North Highlands, cuzz" to claim a territory.

*Closing Arguments*

The prosecutor argued that if the jury believed defendant had a gun at any time during the robbery, it should find the personal use allegation true. Yet the prosecutor also emphasized that the jury did not need to find that defendant ever held the gun or was the shooter to find him guilty of robbery and murder. The prosecutor stated his theory of defendant's culpability was felony murder. He continued with the following argument: Under the felony-murder theory of culpability, "[t]here are certain crimes that if you commit them and a death occurs during the commission of those crimes, you are guilty of murder. . . . [¶] . . . [¶] That's because robbery is an inherently dangerous crime." As a

---

[9] The gang expert testified that defendant was not listed as a gang member and he did not know if codefendant was a gang member.

result, even if the jury believed that defendant grabbed codefendant from behind, it did not matter because defendant participated in the robbery and the victim was killed. As for the special circumstance finding, the prosecution did not discuss what it meant to have reckless indifference to human life or how defendant's purported actions in grabbing codefendant should be considered in the jury's analysis.

### *Jury Instructions and Verdicts*

The jury instructions included CALJIC No. 17.19, regarding personal use of a firearm, and CALJIC No. 17.15, regarding whether a principal was armed with a firearm. The jury was also instructed on CALJIC No. 8.80.1, which provides in part, that if the jury was unable to decide whether defendant was the actual killer or an aider and abettor, the jury could not find the special circumstance to be true as to defendant unless the jury either found beyond a reasonable doubt that defendant, with the intent to kill, aided and abetted the shooter in the commission of the first degree murder, or with reckless indifference to human life and as a major participant, aided and abetted in the commission of the crime of robbery which resulted in the death of the victim. The jury was further told that a "defendant acts with reckless indifference to human life when that defendant knew or was aware that his acts involved an extreme likelihood that such acts could result in the death of an innocent human being."

As mentioned, the jury found defendant guilty of first degree murder, second degree robbery and attempted second degree robbery. It found defendant not guilty of attempted murder of the Oldsmobile driver, Moore, and rejected allegations that defendant personally used a firearm. Instead, the jury sustained lesser-included allegations that a principal was armed during the crimes. It also found the murder occurred during the commission of a robbery. The trial court sentenced defendant to life in prison without the possibility of parole.

13

## HABEAS CORPUS PETITION

In his petition for writ of habeas corpus, defendant alleged that the evidence was insufficient to sustain the special circumstance finding in light of *Banks, supra*, 61 Cal.4th 788 and *Clark, supra*, 63 Cal.4th 532. In its ruling, the trial court stated there were two competing versions of the incident presented at trial: one version wherein defendant was the shooter and if anyone grabbed and restrained him, it was codefendant, and one wherein codefendant was the shooter, and it was defendant who grabbed and restrained him. The trial court found that the jury clearly believed the driver of the convertible who testified that codefendant was the shooter and did not believe the people who were with defendant in the Hyundai and who testified that defendant was the shooter. The court reasoned that by finding the personal use gun enhancement allegation not true, it was reasonable to infer that the jury must have rejected all the testimony that placed a gun in defendant's hands and, instead, believed that defendant tried to prevent codefendant from firing the weapon again by physically restraining codefendant. The trial court also relied upon the jury's acquittal of the attempted murder charge to find that it was "readily apparent" that the jury did not believe that defendant shot the driver or intended that anyone should die, and that the court could infer that the jury actually believed that defendant acted to prevent codefendant from firing any more shots from the gun.

The trial court acknowledged that the jury found defendant guilty of robbery and found true the robbery-murder special-circumstances allegation. In terms of the robbery, the trial court found that the verdict meant the jury found defendant aided and abetted the robbery. The trial court was not confident, however, that the robbery-murder special-circumstance finding meant that the jury properly found defendant was actually a major participant with reckless indifference to human life. The trial court noted that neither the jury instructions nor the parties' argument explained that the jury would have to find

14

defendant acted with reckless indifference to human life in all his actions, including his actions in restraining codefendant.

After analyzing the factors as established in *Banks* and *Clark*, with its interpretation of the evidence shaped by the jury's verdicts and its extrapolation thereof, the trial court concluded that defendant did not act with reckless indifference to human life, the true finding on the robbery-murder special circumstances was not supported by substantial evidence, and vacated that finding.

Under section 1506, the People are entitled to an appeal from a trial court's grant of relief through habeas corpus, and this court has appellate jurisdiction to review those proceedings. (*In re Schiering* (1979) 92 Cal.App.3d 429, 433-434.)

**DISCUSSION**

I

*Standard of Review*

The parties agree that a review for substantial evidence is the proper standard of review in challenges to the sufficiency of the evidence supporting a special circumstance finding.

Although "sufficiency of the evidence claims are generally not cognizable on habeas corpus," an exception to this rule applies when a new decision "clarifies the kind of conduct proscribed by a statute" and shows the court has acted in excess of its jurisdiction. (*Scoggins, supra*, 9 Cal.5th at pp. 673-674.) A defendant in Wright's position is entitled to habeas corpus relief " ' "if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct." ' " (*Id*. at p. 674.)

A postconviction challenge to a special circumstance finding under *Banks* and *Clark* presents a legal question for the reviewing court. (*In re Miller* (2017) 14 Cal.App.5th 960, 979-980 (*Miller*); see also *Banks, supra*, 61 Cal.4th at p. 804.) In addition, because the trial court granted relief without an evidentiary hearing, there are no

15

disputed issues of fact and the usual deference that would apply to the review of a trial court's ruling based on its superior ability to resolve factual questions (e.g., the credibility of witnesses appearing before it) is unwarranted, rendering our review of the trial court's decision de novo. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 677 [where trial court granted a habeas corpus petition "based solely upon documentary evidence," appellate court will "independently review the record"]; *In re Zepeda* (2006) 141 Cal.App.4th 1493, 1496-1497 [when a superior court grants habeas corpus relief without an evidentiary hearing the question presented on appeal is a question of law].)

Faced with a challenge to the sufficiency of the evidence claim as to a special circumstance, our review of the record is deferential. The question is "whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the [special circumstance] allegation beyond a reasonable doubt.' [Citations.] . . . [Citation.] We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial." (*Clark, supra*, 63 Cal.4th at p. 610.) To answer this question, we must first determine whether, and to what extent, the scope of the evidence is limited by the jury's verdicts.

II

*Impact of the Jury's Verdicts*

Under statutory and constitutional law, the jury was required to determine the ultimate fact as to whether defendant personally used a firearm during the commission of the offense. (See §§ 1150, 1152, 1158a; *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 ["any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt"].) The jury found the allegation not true, and this is the equivalent of an acquittal. (See §§ 1155, 1165.) Because the burden of proof was on the prosecution, an acquittal will usually

16

mean only that the jury was not convinced beyond a reasonable doubt of a fact advanced by the prosecution. (*People v. Harrison* (2021) 73 Cal.App.5th 429, 440; see also *In re Coley* (2012) 55 Cal.4th 524, 554 ["numerous federal and California decisions . . . uniformly hold that a jury verdict acquitting a defendant of a charged offense does *not* constitute a finding that the defendant is factually innocent of the offense or establish that any or all of the specific elements of the offense are not true"].) As defendant's jury was instructed that the "term 'personally used a firearm' . . . means that the defendant must have intentionally displayed a firearm in a menacing manner, intentionally fired it, or intentionally struck or hit a human being with it," the not true finding means that the jury found the People failed to prove those facts beyond a reasonable doubt. (CALJIC No. 17.19.) The jury found true, however, that a principal was armed with a firearm. (CALJIC No. 17.15.) We conclude from these verdicts only that the People failed to prove beyond a reasonable doubt that defendant personally used a firearm, as defined in the jury instruction.

The parties dispute to what extent the jury's not true finding on the personal use allegation should be considered in our analysis. The People ask us to review the matter in complete ignorance of the jury's finding[10] and defendant asks us to adopt the position, as did the trial court, that the jury's finding not only meant that he was not the shooter, and had never touched the gun, but that the jury believed he physically restrained the

---

[10] The People's failure to raise the issue below deprived the parties and the trial court the opportunity to appropriately shape and respond to this legal argument. Generally, a party's " ' "failure to make a timely and specific objection" ' " on the ground asserted on appeal makes that ground not cognizable on appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 434.) However, because this argument relates to a challenge to the proper standard of review and we are aware of no authority holding a party may forfeit application of the proper standard of review by failing to object in the trial court, and in light of our de novo review, we will address the issue. (See *Russell v. Department of Corrections & Rehabilitation* (2021) 72 Cal.App.5th 916, 936.)

shooter in an attempt to prevent him from firing the weapon again, and thus "saved lives." While there is a dearth of authority explaining the impact of a jury finding, on appellate review, of the sufficiency of the evidence for a special circumstance from a grant of habeas corpus relief, an examination of analogous cases leads us to conclude both parties ask too much. (See, e.g., *People v. Cooper* (2022) 77 Cal.App.5th 393 (*Cooper*) [and cases cited therein].) In rejecting both positions, we explain the factual and legal influence a jury's finding has on a sufficiency of the evidence analysis in this context.

Considering the evidence through the lens offered by the People would equalize the evidentiary value of all the trial evidence. In conducting our deferential review of whether substantial evidence supports the special circumstance finding, we would be able to consider *any* facts that substantially support the special circumstance finding without pause for consideration as to whether the jury already determined a contested fact or settled evidentiary or credibility conflicts. The People argue that this type of analysis is routinely conducted in cases reviewing the sufficiency of the evidence. In doing so they rely on cases that conducted this type of analysis in the face of inconsistent verdicts. (See, e.g., *People v. Price* (2017) 8 Cal.App.5th 409, 452-45; *People v. Brugman* (2021) 62 Cal.App.5th 608, 633-634.)[11] Under those circumstances, a review for sufficiency of

---

[11] At oral argument, the People relied on *People v. Price* as an example of a case that rejected a contention of inconsistent verdicts. Although the People did not specify which *Price* decision they referenced, we presume this refers to *People v. Price, supra*, 8 Cal.App.5th 409 (*Price*), as cited in their opening brief, as opposed to a subsequent appeal in the same case, *People v. Price* (A159439, app. pending), review granted February 9, 2022, S272572, vacated and transferred for reconsideration in light of *People v. Strong, supra*, 13 Cal.5th 698 on September 28, 2022. We disagree that *Price* rejected a contention of inconsistent verdicts. The defendant argued the special circumstance could not be affirmed on the basis that she was the actual killer because the jury found the allegation the defendant personally used a firearm causing great bodily injury to the victim not true. The court analyzed the claim in the context of inconsistent verdicts and

18

the evidence involves an assessment of whether the trial evidence could support any rational determination of guilt beyond a reasonable doubt, "independent of the jury's determination that evidence on another count was insufficient." (*People v. Lewis* (2001) 25 Cal.4th 610, 656, citing *United States v. Powell* (1984) 469 U.S. 57, 67.)

Here, however, we do not have inconsistent verdicts, as the not true personal use finding is not clearly antagonistic to, and absolutely irreconcilable with, the other verdicts under any rational view of the evidence. (See *People v. Taylor* (2004) 118 Cal.App.4th 11, 23-24, citing *Lowen v. Finnila* (1940) 15 Cal.2d 502, 504.) Defendant's participation in the robbery or felony murder did not require him to personally use a firearm, so there is no inconsistency between the guilty verdicts holding defendant accountable for those offenses and the not true finding on the personal use of a firearm allegation. Nor are those guilty verdicts irreconcilable with the jury's acquittal of the charges relating to the attempted murder of Moore. The People present no argument to the contrary and do not offer any other authority for why wholly disregarding the negative finding in the absence of inconsistent verdicts, is required.

Indeed, if we were to rely on the theory that defendant personally used a firearm in reviewing the sufficiency of the evidence of the special circumstances finding, such reliance would be inconsistent with the jury's finding, and effectively turn the jury's acquittal and not true finding into their opposites. (See *Cooper, supra*, 77 Cal.App.5th at p. 413, citing *People v. Arevalo* (2016) 244 Cal.App.4th 836, 841 & *People v. Piper* (2018) 25 Cal.App.5th 1007.) This would also violate the well-settled rule that "courts must make every effort to interpret a jury's verdict as being consistent." (*People v. Taylor, supra*, 118 Cal.App.4th at p. 23.)

---

rejected it. *Price* did not address whether the jury's finding on the firearm use allegation constituted a credibility determination as to whether the defendant was the shooter, and thus foreclosed that factual consideration for purposes of *Banks/Clark.*

Moreover, the reason why a reviewing court disregards inconsistent jury findings when conducting a sufficiency of the evidence analysis does not justify disregarding the jury finding in this case. Generally, if a not true finding of an enhancement allegation is inconsistent with a conviction of the substantive offense, effect is given to both, because "it is unclear whose ox has been gored" by the jury's verdicts. (*United States v. Powell* (1984) 469 U.S. 57, 65.) The jury may have been convinced of guilt but arrived at an inconsistent acquittal or not true finding "through mistake, compromise, or lenity . . . ." (*Ibid*.) Because the defendant is given the benefit of an acquittal, "it is neither irrational nor illogical to require her to accept the burden of conviction on the counts on which the jury convicted." (*Id*. at p. 69.) Here, the jury rejected the allegations that defendant personally used a gun or attempted to kill the driver of the convertible but found him responsible for the robberies and murder that took place during those robberies. In our view, those findings reflect either a considered culpability determination, or a proof problem with the prosecution's case, but are not irreconcilable with each other.[12] (Cf. *People v. Gonzalez* (2018) 5 Cal.5th 186, 208 [where the verdicts and findings are reconcilable, the jury's willingness to acquit a defendant of a firearm-related charge and find the gun-related allegations not true provides some indication the jury carefully weighed the evidence; the firearm-related findings constitute the jury's determination that it could not be confident beyond a reasonable doubt about the veracity of certain facts].) We are therefore not convinced that this finding must be entirely disregarded. This is especially true where, as here, there was no evidentiary hearing in the habeas corpus proceedings, and thus no credibility determination, other than those made by the jury, to

---

[12] We note the jury in the original trial also rejected allegations that codefendant was a principal armed with a handgun or personally used a firearm during the commission of the crimes, which leads us to suspect each jury found the evidence insufficient to determine the identity of the shooter. (*People v. Wright, supra*, 52 Cal.App.4th at p. 205.)

20

which we can defer. (See *In re Long* (2020) 10 Cal.5th 764, 774 [" 'The central reason for referring a habeas corpus claim for an evidentiary hearing is to obtain credibility determinations' "].) Defendant also argues that the doctrine of collateral estoppel, which "precludes relitigation of issues argued and decided in prior proceedings" prevents consideration of facts supporting defendant's use of the firearm in any way.[13] (See *Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341, fn. 3 [in modern usage, collateral estoppel is described as "issue preclusion"].) Collateral estoppel applies if certain conditions are met, including where the issue decided is identical to the one which is sought to be relitigated. (*People v. Santamaria* (1994) 8 Cal.4th 903, 910-913.) Here, the allegation that defendant personally used the gun is not being relitigated. Rather, the question before us is whether the facts of the case operate to *preserve* the special circumstances finding. Thus, collateral estoppel does not apply here. (Cf. *People v. Myles* (2021) 69 Cal.App.5th 688, 704 [in a former § 1170.95 proceeding, "double jeopardy principles are not at stake because defendant is voluntarily seeking to vacate her prior conviction, not subjecting herself to a new trial or the possibility of increased punishment"].)

---

[13] Defendant cites to *People v. Strong, supra*, 13 Cal.5th at page 720, a decision in which the California Supreme Court considered the preclusive effect of a special circumstance finding on obtaining relief under section 1172.6. The court held that neither a jury's special circumstances findings nor a court's later sufficiency of the evidence review necessarily precludes relief under section 1172.6 because, although the requirements for collateral estoppel were met, the change in law regarding felony murder rendered the doctrine inapplicable. (*Strong*, at p. 717.) Under section 1172.6, that defendant could have an evidentiary hearing, with additional fact finding, because "changes in the law mean there is now 'a different apple.' [Citation.]" (*Strong*, at p. 718.) *Strong* provides no guidance on how to use the facts relating to an allegation the jury rejected, in reviewing a collateral proceeding held without the benefit of an evidentiary hearing and additional fact finding.

21

Defendant's challenge to the special circumstance finding does not involve resolution of disputed facts; in fact, he is only entitled to habeas corpus relief if there is no material dispute as to the facts relating to his conviction and the statute under which he was convicted did not prohibit his conduct. (*Scoggins, supra*, 9 Cal.5th at p. 674.) Under a substantial evidence review, we must accept the reasonable inferences supporting the verdict over any inferences (even if reasonable) proffered by the party seeking to challenge it. (*People v. Shamblin* (2015) 236 Cal.App.4th 1, 15; see also *People v. Rundle* (2008) 43 Cal.4th 76, 137 [if there is substantial evidence supporting the verdict, it is insufficient for a defendant to cite to "various items of evidence in isolation . . ."], disapproved of on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Thus, we conclude that the "totality of the circumstances" required for reviewing the sufficiency of the evidence must be derived from the evidence presented in defendant's trial and necessarily framed by the jury's resolution of evidentiary conflicts and determination of the credibility of witnesses, including the jury's rejection of the allegation that defendant personally used a gun. (See *Banks, supra*, 61 Cal.4th at p. 802 [requiring a reviewing court to look at the totality of the circumstances].)

We find support for our conclusion in cases addressing various resentencing statutes. In *Cooper, supra*, 77 Cal.App.5th at page 417, the issue before the court was the defendant's resentencing petition pursuant to former section 1170.95, which had recently been amended by Senate Bill 1437. The defendant was convicted at trial of first degree murder and kidnapping but acquitted of being a felon in possession of a firearm (while the jury found a principal was armed) and subsequently filed a petition for relief under former section 1170.95. The People argued that the acquittal only meant that the jury did not find him guilty beyond a reasonable doubt. The defendant argued that the acquittal should be treated as a finding that he did not have a gun on that day. (*Cooper*, at p. 407.) After an evidentiary hearing, the trial court denied the petition, finding that the defendant possessed and fired a gun on the day in question and was therefore a major participant

22

with reckless indifference to human life. (*Id*. at pp. 408-409.) On appeal, the appellate court considered the preclusive effect of the defendant's acquittal of a firearm possession charge in considering his eligibility for relief under former section 1170.95. The court concluded that the previous acquittal of the firearm possession charge constituted a finding inconsistent with the trial court's theory that he was a major participant because the trial court heavily relied on the theory, rejected by the jury, that the defendant was armed throughout the event. (*Cooper*, at p. 417.) The appellate court reversed the trial court's order denying the petition and remanded the cause for a new hearing under former section 1170.95, subdivision (d), without consideration of evidence that the defendant possessed the gun. (*Cooper*, at pp. 418-419.)

*Cooper* concluded that through former section 1170.95, the Legislature created a "parallel structure" to ensure that first degree murder convictions meet the requirements under amended sections 188 and 189, regardless of whether the defendant was convicted prior to or after the amendments. (*Cooper, supra*, 77 Cal.App.5th at p. 415.) The appellate court held that a trial court could not determine, in a proceeding under former section 1170.95, subdivision (d), whether the prosecution had proven beyond a reasonable doubt that the defendant could be convicted of murder under the amended law by considering evidence that the jury previously found not true beyond a reasonable doubt. (*Cooper*, at p. 414.) In this way, former section 1170.95 is similar to the resentencing provision in Proposition 36, as set forth in section 1170.126. (*Cooper*, at pp. 414-415 [noting similarity in the parallel structures of resentencing provisions of Prop. 36 and former § 1170.95].) In fact, *Cooper* relied upon the reasoning in cases involving resentencing eligibility under Proposition 36 in reaching its conclusion.

For example, in *People v. Arevalo, supra*, 244 Cal.App.4th 836, the defendant was convicted at trial of a third strike but acquitted of a charge of possession of a firearm by a felon, and an allegation that he was armed with a firearm was found not true. The defendant subsequently petitioned for resentencing under Proposition 36, but the trial

23

court found him ineligible based on its own review of the trial evidence that supported the conclusion that the defendant was armed with a firearm or deadly weapon. (*Arevalo*, at pp. 843-844.) The trial court justified doing so by noting that the original trial court found the " 'armed with a firearm' allegation" not true, but that " '[a] finding of an allegation of "not true" does not mean the nonexistence of guilt, factual innocence, or incredulity of testimony given at trial.' " (*Id.* at p. 844.) The appellate court concluded that any factor precluding eligibility for resentencing under Proposition 36 must be proven beyond a reasonable doubt and because that standard was not met at trial, the trial court was precluded from finding otherwise. The court explained that otherwise, "nothing would prevent the trial court from disqualifying a defendant from resentencing eligibility consideration by completely revisiting an earlier trial, and turning acquittals and not-true enhancement findings into their opposites." (*Arevalo*, at p. 853.)

Similarly, in *People v. Piper, supra*, 25 Cal.App.5th 1007, the appellate court concluded that on a resentencing petition under section 1170.126, the trial court may not make an eligibility determination contrary to the jury's verdict and findings at trial. To do so would allow the People to " 'compensate for any potential evidentiary shortcoming at a trial . . . .' " (*Piper*, at p. 1015.)

We acknowledge that we are not dealing with a parallel structure between a resentencing provision, like former section 1170.95 and section 1170.126, and an amended law where each require proof beyond a reasonable doubt. Rather, this case involves a defendant who was initially denied access to the ameliorative parallel structure of the resentencing provision in former section 1170.95 and the amended law by virtue of his pre-*Banks/Clark* special-circumstance finding. Seeking to challenge this finding through a habeas corpus petition, he is required to carry the burden as to whether there is substantial evidence to support the finding. Nevertheless, through Senate Bill 1437, the Legislature intended " 'to ensure our state's murder laws "fairly address[] the culpability of the individual and assist[] in the reduction of prison overcrowding, which partially

24

results from lengthy sentences that are not commensurate with the culpability of the individual." [Citations.]' " (*People v. Nash* (2020) 52 Cal.App.5th 1041, 1082-1083.) Thus, the goal of Senate Bill 1437, just as in Proposition 36, is to seek a better fit between punishment and culpability. (See *Cooper, supra*, 77 Cal.App.5th at p. 415.) It would be contrary to that goal to require the defendant to labor under the burden of a theory that was rejected by the jury at trial, when doing so would invite inconsistencies in the deliberative process.

Thus, we find it appropriate, when determining the sufficiency of the evidence of the special circumstance finding, to give defendant the benefit of the jury's finding that he did not personally use a firearm in the commission of the offenses for which he was convicted.

It is through this lens that we view the evidence.

## III

### *Analysis*

The terms "major participant" and "reckless indifference to human life" in section 190.2, subdivision (d) are drawn from the United States Supreme Court's jurisprudence on the constitutionality of the death penalty in cases of felony murder, ultimately concluding that if a defendant was not the actual killer but was a major participant in the underlying felony and acted with reckless indifference to human life, the Eighth Amendment does not prohibit the imposition of the death penalty as disproportionate. (*Tison v. Arizona* (1987) 481 U.S. 137, 158 (*Tison*).)

Because section 190.2 incorporates the standard established in *Tison*, California courts have looked to *Tison* for guidance in defining the concepts of major participation and reckless indifference to human life. (See *Scoggins, supra*, 9 Cal.5th at p. 675; *Banks, supra*, 61 Cal.4th at p. 798.) Our California Supreme Court has viewed *Tison*, in conjunction with *Enmund v. Florida* (1982) 458 U.S. 782 (*Enmund*) as "represent[ing] points on a continuum." (*Banks*, at p. 802.) The defendants in *Tison* were sufficiently

25

culpable to justify the application of the death penalty, but the defendant in *Enmund* was not. "Somewhere between them, at conduct less egregious than the Tisons' but more culpable than Earl Enmund's, lies the constitutional minimum for death eligibility." (*Ibid*.)

In *Enmund*, the defendant and two others robbed an elderly couple at their home. When the couple resisted, one or both of Enmund's cohorts shot and killed the couple. Enmund, who was waiting in a car nearby, drove his cohorts away and helped them dispose of the murder weapons. (*Enmund, supra*, 458 U.S. at p. 784.) The court held that the imposition of the death penalty was an unconstitutionally disproportionate punishment as to Enmund, who had not intended for a killing to take place and was not present for the murders. (*Id.* at p. 788.)

In contrast, the imposition of the death penalty in *Tison* was affirmed on appeal. Three brothers "assembled a large arsenal of weapons" to break their father and another inmate, both convicted murderers, out of prison. (*Tison, supra*, 481 U.S. at p. 139.) The brothers armed the two prisoners, locked up the prison guards, and helped the prisoners escape. (*Ibid*.) A few days later, the group got a flat tire and flagged down a passing car for help. (*Id.* at pp. 139-140.) They kidnapped the family that was in the car and robbed them. (*Id.* at p. 140.) Two brothers then guarded the family while their father considered what to do next. (*Ibid*.) Eventually, the father shot all of the family members, and the group of perpetrators left the victims to die without rendering aid. (*Id.* at p. 141; *Scoggins, supra*, 9 Cal.5th at p. 675.)

In *Banks* and *Clark*, the California Supreme Court sought to provide further guidance for determining a felony murder aider and abettor's eligibility for the death sentence or life imprisonment without parole, in light of section 190.2 and the *Tison*/*Enmund* continuum. (*Banks, supra*, 61 Cal.4th at pp. 800-801.) Noting that the statute "imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life," the court

determined that a sentencing body "must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Id.* at pp. 798, 801.) In *Banks*, the court established a list of factors relevant to determining whether a particular defendant was a major participant in the underlying felony and in *Clark*, the court considered the second requirement for the special circumstance, reckless indifference to human life.

We now apply the *Banks*/*Clark* factors to determine whether substantial evidence supports the jury's finding that defendant was a major participant in the robbery and acted with reckless indifference to human life, taking each question in turn. In conducting our analysis, we note that we take the jury's not true finding on the personal use of a firearm allegation only for what it is, that defendant did not intentionally display a firearm in a menacing manner, intentionally fire it, or intentionally strike or hit a human being with it. We do not extend such finding to necessarily include, as the trial court did, the conclusion that the jury determined defendant had acted to prevent codefendant from continued firing, and thereby saved lives. We review the *entirety* of the evidence, in deference to the jury's finding in support of the special circumstance allegation, and as we have indicated, are required to accept the reasonable inferences supporting such verdict.

A. *Major Participant*

To be a major participant, a defendant's participation in criminal activities known to carry a grave risk of death must be sufficiently significant to be considered "major." (*Clark, supra*, 63 Cal.4th at p. 611.) In answering that question, we consider the totality of the circumstances. Relevant considerations include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past

27

experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted.)

Considering these *Banks* factors, we conclude substantial evidence supports the jury's finding that defendant was a major participant in the robbery. First, there was evidence that defendant initiated the encounter leading to the robbery with codefendant. Defendant directed the driver to make a U-turn, and immediately got out of the car to approach the convertible with codefendant. Almost immediately, the robbery was instigated and a weapon was presented. The evidence demonstrates defendant was a willing participant in the robbery from its inception. Indeed, the jury's finding defendant guilty of the robbery and attempted robbery charges, reflects this interpretation.

Next, we consider whether defendant was aware of the "particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants" of the robbery. (*Banks, supra*, 61 Cal.4th at p. 803.) We conclude the manner in which the robbery was conducted and the way it unfolded do support a finding that defendant was aware of the danger presented here. Notably, the gun was brandished in close proximity to the convertible passengers, codefendant demanded to know where they were from, and the driver was tapped on the head with the gun. As this transpired, defendant gained knowledge of the particular dangers posed by the nature of the armed robbery and, although there is some evidence that *after* shots were fired defendant may have intervened, he did not appear surprised by the brazen nature of the robbery itself and the violent and dangerous manner in which it occurred after he himself had initiated the encounter leading to the robbery by flagging down the victims' car. Additionally, there was testimony that defendant was the one who demanded money, telling the occupants in the victims' car to "break yourself."

28

The People argue that it can also be reasonably inferred from defendant's purported gang membership and knowledge of violence in the gang culture that codefendant would be willing to resort to violence. In other words, defendant should have expected codefendant to commit a violent felony at any time, solely due to his gang membership status. As defendant notes, courts have rejected such efforts to substitute generic evidence about the general dangerousness of gangs for actual proof that a given defendant was aware that the specific perpetrator was likely to employ fatal force. (See, e.g., *Banks, supra*, 61 Cal.4th at pp. 810-811 [where no evidence indicated the codefendants who belonged to the same gang had ever participated in shootings, murder, or attempted murder, or even that any member of their clique had, there could be no reasonable inference that the defendant knew the codefendants would be likely to kill]; *Miller, supra*, 14 Cal.App.5th at p. 976 [no reasonable inference the defendant knew codefendant was likely to kill where membership in the same gang and commission of follow-home robberies together in the past did not substitute for the lack of evidence that they had ever participated in shootings, murder, or attempted murder].)

Although there is no evidence defendant knew the Hyundai passengers well or had any knowledge regarding codefendant's criminal history, past gun use, or details regarding his propensity for violence at the time of the shooting, when this evidence is weighed against the manner in which the robbery was conducted, the balance weighs in favor of concluding defendant was aware of the particular dangers of the crime.

We also consider whether defendant was present at the scene of the murder and in a position to prevent it, whether his own actions or inactions played a role in the death, and what defendant did after lethal force was used. As our Supreme Court explained, " ' "the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts. If the defendant fails to act as a restraining influence, then the defendant is arguably more

29

at fault for the resulting murders." ' [Citation.]" (*Scoggins, supra*, 9 Cal.5th at p. 678.) First, there is no dispute that defendant was present at the scene of the murder, and actively involved in the robbery when the murder occurred. He was clearly in a position to prevent the murder, had he taken action when the gun was first produced during the robbery; instead, defendant failed to intervene or to stop the escalation of the crime. In fact, his presence could arguably be seen as bolstering codefendant's confidence to act in a more reckless and cavalier manner.

Second, as discussed above, defendant's actions and inactions both played a role in the death, as he initiated the violent encounter, and emboldened codefendant by assisting him. After the lethal force was used, he ran away, changed his appearance, and attempted to hide the evidence, as we discuss in more detail below when discussing reckless indifference.

Defendant argues that the record demonstrates that he took actions after the first shot was fired to prevent additional harm. In particular, his display of shock after the first gunshot suggests that he was surprised the gun was actually used, and at that point, he argues the evidence suggests that he physically restrained codefendant in an attempt to prevent further use of the gun. The People acknowledge the evidence indicated that defendant restrained the shooter but argue that the jury could have inferred those actions were really an attempt to flee. Defendant responds that this is not a reasonable inference from the evidence in light of the fact that several people testified that defendant yelled at the shooter to get him to stop either before or while he restrained codefendant.

Like much of the testimony in this case, the evidence as to who grabbed who and for what purpose, is inconsistent and unclear. The time between the first and second shot was not very long, possibly as short as a couple of seconds. The driver of the convertible, Moore, testified that after codefendant fired the gun at the murder victim, Brown, defendant grabbed codefendant from behind in a bear hug and said something to the effect of "stop" or "cut it out," "you already shot him" or "leave him alone." At the same

30

time, or very close in temporal proximity, the female Hyundai passenger, Richardson, yelled "let's go . . . let's get out of here." There was also testimony by Armstrong that after the shots were fired, it was defendant who was restrained and pulled back to the car. Overall, this evidence could support an inference either that defendant restrained the shooter in an effort to stop bloodshed, as defendant argues, or that he did so in an effort to flee, as the People argue. Notably, the jury verdicts do not assist us in determining which version the jury believed. In reaching its verdicts,[14] the jury could have found that, even if defendant did restrain codefendant and whatever his intent in doing so, he did so *after* he acted as a major participant in the robbery, which lead to the murder.

Reviewing the totality of the evidence in the light most favorable to the prosecution, without reliance on the People's theory that defendant used a firearm, there is substantial evidence to support a finding that defendant was a major participant in the robbery that resulted in the murder.

B. *Reckless Indifference*

We next consider whether defendant acted with reckless indifference to human life. "Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, ' "[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the

---

[14] Specifically, guilty of first degree murder and attempted second degree robbery of Brown, second degree robbery of Moore, but acquitting defendant of attempted murder and the lesser included offenses of attempted voluntary manslaughter and assault with a firearm of Moore.

31

standard of conduct that a law-abiding person would observe in the actor's situation." '
[Citation.] 'Awareness of no more than the foreseeable risk of death inherent in any
[violent felony] is insufficient' to establish reckless indifference to human life; 'only
knowingly creating a "grave risk of death" ' satisfies the statutory requirement."
(*Scoggins, supra*, 9 Cal.5th at p. 677.) To determine whether defendant had the requisite
mental state, "[w]e analyze the totality of the circumstances" in a manner that largely
overlaps with our major participant discussion. (*Ibid.*)

Specifically, we turn to several considerations our Supreme Court found relevant
in determining whether a defendant acted with reckless disregard to human life: "Did the
defendant use or know that a gun would be used during the felony? How many weapons
were ultimately used? Was the defendant physically present at the crime? Did he or she
have the opportunity to restrain the crime or aid the victim? What was the duration of the
interaction between the perpetrators of the felony and the victims? What was the
defendant's knowledge of his or her confederate's propensity for violence or likelihood
of using lethal force? What efforts did the defendant make to minimize the risks of
violence during the felony?" (*Scoggins, supra*, 9 Cal.5th at p. 677.) Just as with
consideration of major participant, these factors are not exhaustive, sufficient, or
necessary to establishing whether the defendant's conduct met the standard for the special
circumstance.

The People argue that defendant should be subject to the special circumstance
finding because the armed robbery was gang related, took place in a residential
neighborhood with bystanders nearby, the shooting was not an accident, and defendant
later expressed dismay that all he got was $10. The People also seemingly admit that
codefendant was the shooter, yet still maintain that the evidence supported the conclusion
that defendant used the gun.

As covered in our major participant discussion, we do not rely on the People's
theory that defendant personally used a firearm, as that would be inconsistent with the

32

jury's finding the personal use allegation not true. (*Cooper, supra*, 77 Cal.App.5th at pp. 416-418.)  We also acknowledge "[t]he intent to commit an armed robbery" or "[t]he mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Banks, supra*, 61 Cal.4th at p. 799; *Clark, supra*, 63 Cal.4th at p. 618.)  Notwithstanding such, we find there is substantial evidence supporting the conclusion that defendant acted with reckless indifference.

The presence of a gun and the manner in which the gun was intended to be used are factors we may permissibly consider. (*Banks, supra*, 61 Cal.4th at p. 801; see *Clark, supra*, 63 Cal.4th at pp. 617-618.)  Here, defendant instigated the encounter with the convertible by directing the driver to turn around.  Two passengers in the convertible testified that the Hyundai stopped near the victims' vehicle, blocking off their escape route.  Defendant and codefendant then immediately approached the victims' car as a pair while one of them wielded a gun and threatened the occupants of the convertible with it.  Defendant not only knew about the presence of the gun, but tacitly approved of the use of the gun as a threat of force behind the robbery.  The use of the gun posed an increased level of danger under these circumstances.  It is reasonable to conclude that the gun was critical to enforce compliance with the robbery and that defendant, having directed the confrontation with the driver of the Hyundai, consciously disregarded the significant risk of death created by the use of the gun in those circumstances.

Additionally, after the gun was used, defendant did not attempt to aid the murder victim.  Defendant argues that the evidence supports the conclusion that he tried to prevent bloodshed by restraining the shooter.  As previously stated, there is conflicting evidence on this, and this factor thus does not benefit defendant.  In the end, however, defendant fled without rendering aid to, or inquiring on the condition of, the murdered victim.  Instead, defendant returned to the party, changed into different clothes, expressed disappointment over the proceeds from the robbery, then attempted to concoct a story about the Hyundai being stolen in an attempt to distance himself from the robbery and

murder. This evidence supports the jury's finding that defendant acted with reckless indifference and satisfies the requirements of *Banks* and *Clark*.

Generally, defendants who have been successful in petitioning for a writ of habeas corpus to have their special circumstance findings vacated under *Banks* and *Clark* are those who were not present for the shooting (either because they were acting as getaway drivers or because they were involved in the planning of the crime only). (See, e.g., *Miller, supra*, 14 Cal.App.5th at p. 965 [the defendant selected the robbery target and was not at the scene of the robbery/murder]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1019-1020 [the defendant was involved in planning the robbery but was not at the scene of the murder]; *In re Ramirez* (2019) 32 Cal.App.5th 384, 404-406 [the defendant acted as getaway driver and was not at the scene of the murder]; *In re Taylor* (2019) 34 Cal.App.5th 543, 559 [same].) Defendant's conduct is clearly distinguishable.

Considering the totality of the circumstances, we conclude the special circumstance finding was supported by substantial evidence.

### DISPOSITION

The trial court's order granting defendant's habeas corpus relief is reversed.


/s/
EARL, J.

We concur:


/s/
HULL, Acting P. J.


/s/
DUARTE, J.